Filed 4/1/14  P .v. Beltran CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> JOSE BELTRAN, <br><br>     Defendant and Appellant. | B246337 <br><br> (Los Angeles County <br>  Super. Ct. Nos. BA388010 <br>  and BA388228) |
| In re JOSE BELTRAN <br><br>     On Habeas Corpus. | B253289 <br><br> (Los Angeles County <br>  Super. Ct. Nos. BA388010 <br>  and BA388228) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Clifford L. Klein, Judge.  Judgment affirmed; Petition for Writ of Habeas Corpus denied.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jose Beltran was convicted by a jury of one count of second degree murder (Pen. Code,[1] § 187, subd. (a)) with personal use of a firearm (§ 12022.53, subds. (b), (c), (d)), two counts of attempted murder (§§ 664/187, subd. (a)) with personal use of a firearm (§ 12022.53, subds. (b), (c), (d)), one count of shooting at an occupied vehicle (§ 246), and one count of carrying a loaded handgun not registered to him (§ 12031, subd. (a)(1)).  He appeals from the judgment sentencing him to a prison term of 77 years to life, plus 8 months.  We affirm.

## BACKGROUND

In August 2011,[2] Juan David Vasquez Loma (Vasquez), Luis Lopez, and Jonathan Mendoza worked at Garage Pizza in the Silver Lake area of Los Angeles.  Shortly before 5:00 a.m. on August 7, they left the restaurant together at the end of their shift.  They got into Vasquez's pickup truck; Vasquez was in the driver's seat, Mendoza sat next to him, and Lopez was next to Mendoza, by the front passenger window.

Vasquez, who was driving Lopez and Mendoza home, drove down Effie Street toward Fountain Avenue.  He came to a stop sign a few blocks before Silver Lake Boulevard.  There was a dark green Honda stopped at the stop sign.  Vasquez stopped behind the Honda, waiting for it to proceed.  When it did not move after a few minutes, Vasquez drove around it.  As Vasquez passed the car, the driver looked toward the pickup truck through the open driver's side window.  Mendoza and Lopez saw the driver's face.  The driver was Latino, with a skinny build, long face with little bumps on his cheeks and a thin mustache, and his hair was in a buzz

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     All references to dates relate to the year 2011.

2

cut. There also was a Latina woman with long curly hair in a ponytail in the front passenger seat.

Vasquez drove to Silver Lake Boulevard, where he made a right turn. A block later, the Honda pulled up alongside the driver's side of Vasquez's pickup truck. The driver of the Honda turned toward the truck and appeared to be yelling something, but the occupants of the truck could not hear what he was saying because the windows of the truck were rolled up. Vasquez said to Lopez and Mendoza, "What's up with that guy?" Lopez leaned forward to look, and asked, "Does he have a gun?" Vasquez said "Yes," and all three of them leaned back in their seats as they heard a gun firing and an impact on the window. The Honda took off as Vasquez lost control of the truck and crashed into a parked car. Lopez got out of the truck, went to the driver's side, and opened the door. He saw that Vasquez had been shot in the head, and called 911. He told the 911 operator that the person who had shot Vasquez was driving a green Honda, that the driver was a male Latino, and there was a female passenger.[3]

Los Angeles Police Officer Robert Alvarado and his partner were the first to arrive at the scene, at 5:05 a.m. When Officer Alvarado approached the pickup truck, he saw that Vasquez was somewhat conscious and trying to speak. Paramedics took Vasquez to the hospital, where he subsequently died. Deputy Medical Examiner Dr. Ajay Panchal conducted an autopsy, which disclosed that a bullet entered Vasquez's left temple area and did not exit his head. Dr. Panchal recovered the bullet from the right temple lobe of Vasquez's brain. The bullet was examined and found to be consistent with a .32 caliber bullet fired from a semi-automatic weapon.

---

[3] The audiotape of the 911 call was played for the jury at trial; a transcript of the call was provided to the jury and is part of the record on appeal.

3

Detective Jose Carrillo and his partner responded to the crime scene two hours after the shooting, where they recovered a .32 caliber spent shell casing. They left the scene shortly thereafter to interview Lopez and Mendoza at the police station. Detective Carrillo returned to the crime scene later that afternoon. While he was there, a car approached him. The man who was driving, Mark Tubalinal, told him that he may have information about the shooting. Detective Carrillo gave Tubalinal his card and asked Tubalinal to call him the following day to set up an appointment to be interviewed. Although Tubalinal testified that he called the detective sometime after August 7 and left a message, Detective Carrillo never received the message and did not interview Tubalinal until late September or early October, after Tubalinal was arrested for residential burglary.[4]

On August 18, Lopez and Mendoza went to the police station to meet with a sketch artist to put together a composite sketch of the driver of the green Honda. The composite sketch was released to the public on August 19, and a few days later, Detective Carrillo e-mailed an information flyer to the surrounding L.A.P.D. Divisions, Rampart and Hollywood, on the theory that the person involved in the shooting was from the surrounding community. That same day, Detective Carrillo

---

[4]   Tubalinal testified at trial that he had stopped at a 7-Eleven store on Silver Lake Boulevard on his way to work at around 5:00 a.m. on August 7. After exiting the store, he drove on Silver Lake toward Sunset Boulevard and saw two vehicles, a dark green sedan and a pickup truck, side-by-side in the street, blocking the lane in which he was travelling. It appeared that the people in the vehicles were talking. Tubalinal pulled into the opposite lane to pass the vehicles, passing on the left (driver's side) of the green car. As he passed, he saw a Hispanic man in the driver's seat, and heard him yelling, although he could not understand what he was saying. When he was 100 to 200 yards away, he heard two or three "pops," but did not think anything of it until he turned on the television at work and saw a news report of a shooting on Silver Lake Boulevard. When he was interviewed by Detective Carrillo, he was shown a photographic lineup, and identified defendant's photo as the driver of the green car; he also identified defendant at trial.

4

received a call from a detective in the Rampart gang enforcement detail, telling him they had arrested a person who resembled the composite sketch.

The person who had been arrested was defendant. On August 19, Officers Raymond Flores and Garrett Breegle were on patrol when they conducted a traffic stop of a green Honda Accord driven by defendant. Defendant told the officers that he only had a driving permit, and did not have a license. Officer Breegle searched the car and found a loaded nine-millimeter handgun under the driver's seat. When questioned, defendant said that he carried a gun for protection because he recently was stopped by a rival gang member and had been shot at by La Mirada gang members; he said he bought the gun from a friend two or three months earlier.[5] The officers arrested defendant.

After receiving the call from the Rampart detective, Detective Carrillo pulled defendant's photo, noticed the resemblance to the composite sketch, and put together a photographic lineup. He put defendant's photo in the number six position. He showed the photo lineup to Lopez, asking if he could identify anyone. Lopez told him that his attention was drawn to numbers two and six, that they looked a lot alike, and he could not choose between them. Detective Carrillo then showed the photo lineup to Mendoza, who immediately identified number six (defendant) as the person who shot Vasquez.

Using a case tracking system on the L.A.P.D. computer, Detective Carrillo tried to find the woman who was in the car with defendant at the time of the shooting. He identified a possible person, Diana Villeda. He called her and asked her to come to the police station. She came in on August 26, and was interviewed

---

[5] Evidence of defendant's gang membership and other gang evidence was presented at trial, but is not included in this statement of facts because the jury found the gang allegations were not true.

by Detective Carrillo and Detective Burcher.[6]  During that interview, Diana[7] told the detectives that defendant had picked her up from her friend's house and was driving her home on August 7.  They were driving down Effie Street when a black pickup truck came up behind them and made a right turn in front of them. Defendant got angry and followed the truck.  He was yelling at the person in the truck.  The person driving the truck made a gesture, and defendant got his gun from under his car seat and fired a single shot at the truck.

The day after Detective Carrillo interviewed Diana, August 27, he conducted a follow-up at the Los Angeles County jail, and met with defendant.  In the afternoon of August 29, defendant called the Villeda residence and spoke to Diana's younger sister, Daisy.[8]  Defendant told Daisy, "Your sister has to help me out.  She's the only one that's going to be able to get me out. . . .  If she helps me out, then they'll forgive me."  Defendant told Daisy that Diana "has to say that I wasn't right there.  She knows I was right there.  She knows that wasn't my car." When Daisy asked if the police could "lock [Diana] up" as an accomplice, defendant said, "She could say I'm not -- I wasn't an accomplice.  She could say that shit.  She could fight it.  It's going to be easier for her to fight it than me fighting it over here, because she's out there and I'm in here."  Daisy then asked defendant, "What kind of strap[9] is it?"  Defendant responded that his is a nine-

---

**6**    The interview was videotaped, and the tape was played for the jury at trial during the prosecution's cross-examination of Diana, who testified for defendant; the jury also was given a transcript, which is a part of the record on appeal.

**7**    We refer to Diana Villeda by her first name to distinguish her from her sister Daisy, who was later interviewed by Detective Carrillo.

**8**    The telephone call was recorded, and the recording was played for the jury; the transcript of the call, which was provided to the jury, is a part of the record on appeal.

**9**    Detective Carrillo testified that "strap" is street terminology for a handgun.

6

millimeter Luger. Daisy said, "No, not yours. I know which one yours is. The other one." Defendant responded, "A three-two." Daisy told him that his mother told her it was "a 24-something," and defendant said, "I don't know what the fuck it was, but it wasn't my gun. I did not -- it wasn't my gun. We already know that."

At the time of the telephone call, only a few people knew that the gun used to kill Vasquez was a .32 caliber gun; that information had not been given to the public.

A few hours after defendant's telephone call, Diana, Daisy, and their mother came to the police station at Detective Carrillo's request. Detective Carrillo and Detective Burcher interviewed Daisy (with her mother present, because she was 14 years old) and re-interviewed Diana.[10] During Diana's re-interview, Diana told the detectives that defendant was not the person who did the shooting. She said that she was at a party in North Hollywood with a man named Roger. They left the party after Roger got mad and fired a shot at someone. They dropped defendant at home with Daisy, and Roger and Diana left in Diana's mother's car. She said it was Roger, not defendant, who was the shooter. Detective Carrillo told Diana that he did not believe her, and said that he knew that defendant told her to lie, because the calls from jail are recorded. She later admitted that defendant was the person who shot Vasquez, and that what she had told the detectives during her previous interview was the truth.[11]

---

[10] Both interviews were videotaped, but only the recording of Diana's was played for the jury; the transcript of Diana's interview was provided to the jury and is included in the record on appeal.

[11] At trial, Diana testified that Roger May was the shooter, and that she and Roger were in her mother's car (a blue Toyota Corolla) at the time.

Based upon his interviews with the Villedas, the next day, August 30, Detective Carrillo pulled up a current photo of Roger May and compared it with the composite sketch of the shooter. Although he did not see any similarities, he tried to locate Roger May and created a "Wanted For Questioning" flyer on him. He also listened to the recordings of defendant's telephone calls to the Villeda residence, and heard the August 29 call between defendant and Daisy. After listening to that call, he contacted Daisy and re-interviewed her; Daisy recanted what she had earlier told him, and told him that defendant was the shooter.[12] Daisy said that she and Diana were told to lie and name Roger May as the shooter, but she would not say who had instructed her to lie.[13]

Defendant was charged by information with one count of carrying a loaded handgun not registered to him (count 1, § 12031, subd. (a)(1)), one count of murder (count 2, § 187, subd. (a)), one count of shooting at an occupied motor vehicle (count 3, § 246), and two counts of attempted premeditated murder (§§ 664/187, subd. (a)) of Mendoza (count 4) and Lopez (count 5). The information also included gang allegations (§ 186.22, subd. (b)(1)(C)) as to counts 2 through 5, and personal use of a gun allegations (§ 12022.53, subds. (b), (c), (d)) as to counts 2, 4, and 5.

The jury found defendant guilty of carrying a loaded firearm (count 1) and shooting at an occupied motor vehicle (count 3). Although the jury acquitted

---

[12] Daisy was a witness for defendant at trial, and testified that she, defendant, Diana, Roger May, and Roger's brother and uncle returned to defendant's house from a party in North Hollywood in the early morning hours of August 7, and that she and defendant stayed at defendant's house while Diana, Roger, and the rest left in her mother's car.

[13] Evidence was presented at trial that in the evening of August 30, defendant's mother, sister, his sister's husband, Daisy, and Diana went to Garage Pizza and asked to speak to Lopez and Mendoza, to show them a photo and ask if they were sure that the person they had identified really was the person who attacked them in Silver Lake.

8

defendant of first degree murder, it found him guilty of second degree murder (count 2). The jury also found him guilty on both attempted murder counts, but found the attempted murders were not willful, deliberate, and premeditated. Finally, the jury found the gun allegations to be true and returned a "not true" finding on the gang allegations.

The trial court sentenced defendant as follows. On count 2, the court imposed a term of 20 years to life for the murder, plus 25 years to life for the gun allegation; on count 3, the court imposed (and stayed under section 654) the high term of 7 years, plus 25 years to life for the gun allegation; on count 4, a consecutive term of 7 years, plus 25 years to life for the gun allegation; on count 5, a concurrent term of 7 years, plus 25 years to life for the gun allegation; and on count 1, a consecutive term of 8 months (one-third the midterm of 24 months), for a total sentence of 77 years to life, plus 8 months. Defendant timely filed a notice of appeal from the judgment.

## DISCUSSION

Defendant raises five issues on appeal. First, he contends there is insufficient evidence to support the attempted murder convictions because defendant fired only a single shot. Second, he argues the trial court gave an incorrect instruction on attempted murder that allowed the jury to convict on both counts even if they found defendant only intended to kill one of the attempted murder victims. Third, he contends that evidence of the gun found in defendant's car should have been suppressed. Fourth, he asserts the trial court improperly increased the base mandatory minimum sentence on the second degree murder conviction. Fifth, he argues the trial court abused its discretion by allowing the jury to hear a portion of Diana's first interview in which the detectives alluded to defendant's other bad acts. In addition, defendant has filed a petition for writ of

9

habeas corpus (case No. B253289) in which he contends his trial attorney rendered ineffective assistance by failing to properly object and preserve for appellate review the magistrate's ruling denying defendant's suppression motion at the preliminary hearing.

A.    *Sufficiency of the Evidence to Support Attempted Murder Counts*

As defendant correctly observes, "[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328; accord, *People v. Smith* (2005) 37 Cal.4th 733, 740.) Defendant argues that, even assuming he intended to kill Vasquez, there is no evidence he intended to kill Lopez and Mendoza because he fired a single shot and there is no evidence they were in the "kill zone." We disagree.

The fact that defendant in this case fired a single shot at three victims, killing one, does not preclude a finding that he intended to kill all three. In *People v. Smith*, the defendant was convicted of two counts of attempted murder after he fired a single shot at a vehicle in which a woman was seated in the driver's seat and her baby was in a car seat directly behind her. The evidence showed that the defendant fired from directly behind the car, narrowly missing both the woman and the baby. (*People v. Smith, supra*, 37 Cal.4th at pp. 742-743.) The Supreme Court observed that "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive. . . . Nor is the circumstance that the

10

bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill. [Citation.]" (*People v. Smith*, *supra*, 37 Cal.4th at p. 742.) The Court held that evidence that the defendant "purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both. [Citations.]" (*Id.* at p. 743; see also *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 685 ["intent to kill two different victims can be inferred from evidence that the defendant fired a single shot at the two victims, both of whom were visible to the defendant"].)

Defendant attempts to distinguish these cases, arguing that Lopez and Mendoza were not in the line of fire because they were seated in a pickup truck, which has higher seating than the sedan from which he fired the gun. We are not convinced. Both Lopez and Mendoza testified that defendant saw them when the truck drove around the Honda, that they saw defendant when he drove up alongside the truck, and that Lopez, who was farthest away, saw that defendant had a gun. The jury reasonably could infer from this evidence that Lopez and Mendoza were directly in the line of fire when defendant pulled the trigger, and that defendant intended to kill both of them, as well as Vasquez. Therefore, we conclude substantial evidence supports the convictions for the attempted murder of Lopez and Mendoza.

B.     *Jury Instruction on Attempted Murder Counts*

The trial court instructed the jury on attempted murder by giving a modified version of CALCRIM No. 600, as follows: "To prove that the defendant is guilty of attempted murder, the People must prove that: one, the defendant took at least

11

one direct but ineffective step toward killing another person; and  [¶]  two, the defendant intended to kill a person.  [¶]  . . .  [¶]  A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone.  In order to convict the defendant of the attempted murder of Luis Lopez or Jonathan Mendoza, the People must prove that the defendant not only intended to kill Juan Vasquez, but also intended to kill Luis Lopez or Jonathan Mendoza, or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Luis Lopez or Jonathan Mendoza, or intended to kill Juan Vasquez by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of Luis Lopez or Jonathan Mendoza."

Defendant contends this modified kill zone instruction was incorrect because it allowed the jury to convict him of attempted murder of both Lopez and Mendoza if the jury found he intended to kill either one of them.  He argues the error cannot be deemed harmless because the jury did not believe the prosecution's theory of the case in that the jury found defendant not guilty of first degree murder, and made "not true" findings on the premeditation and gang allegations.

We agree that the modified instruction is ambiguous.  "'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.'" (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)  "[W]e view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  We also "consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young*, *supra*, 34 Cal.4th at p. 1202.)

12

In this case, the jury was instructed that "[a] person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone." Referring to this instruction during closing argument, the prosecutor argued that defendant saw and intended to kill everyone in the truck. Defense counsel, on the other hand, argued that if the shooter intended to kill all three men, he would have fired at least three times. In short, the issue presented to the jury was whether defendant intended to kill everyone in truck. The fact that the jury rejected some aspects of the prosecution's theory of the case – i.e., that defendant acted with premeditation and for the benefit of a street gang -- does not mean that the jury also rejected the prosecution's argument that defendant intended to kill everyone in the truck and instead found that he intended to kill only one of the passengers. Indeed, given the seating position of the three men in the truck, all in a line, there is no reasonable likelihood that the jury misunderstood and misapplied the instruction and found that defendant intended to kill one of the attempted murder victims but not the other.

C.      *Suppression of Evidence of Gun*

Defendant contends that evidence of the gun found in his car -- which was discovered in a pre-impound inventory search of the car after defendant was stopped for a Vehicle Code violation and admitted he did not have a driver's license -- should have been suppressed because the decision to impound his car was unreasonable. We conclude defendant forfeited the issue by failing to properly raise the matter before the trial court. In any event, his contention fails on the merits.

To preserve a search and seizure issue for appeal, a defendant is required to raise the issue before the trial court; a motion to suppress brought before the magistrate at the preliminary hearing is not sufficient. (*People v. Lilienthal* (1978)

13

22 Cal.3d 891, 896; *People v. Richardson* (2007) 156 Cal.App.4th 574, 589 [applying *Lilienthal* rule following unification of municipal and superior courts].) In this case, defendant moved to suppress the evidence of the gun at the preliminary hearing. The magistrate denied the motion. On the first day of trial, during argument on defendant's motion to sever count 1 from the other counts, defense counsel stated, "[T]here was a [section] 1538.5 motion heard at the preliminary hearing as well, and the reason for that traffic stop, just to touch up on it – I know the court hasn't had a chance to read that in the entirety – the probable cause for the traffic stop was an air-freshener that was hanging from the rearview mirror, and that issue was litigated at the prelim. I have not found any additional cases to bring to the court's attention, but I just want to reserve that issue on appeal for my client should there be a conviction that he can pursue any issues relating to the unlawful stop with no probable cause of his vehicle on August 19, 2011, and I would submit on that."

Defendant contends on appeal that defense counsel's statement to the trial court is sufficient to preserve the issue. It is not. Although a defendant "need not follow strict procedures to bring a motion to suppress, [he] must make the basis for the motion clear, and must seek and obtain an unambiguous ruling on the motion." (*Anderson v. Superior Court* (1988) 206 Cal.App.3d 533, 542.) Counsel neither made the basis for the motion clear nor obtained a ruling from the trial court. We cannot review a ruling that was never made.

But even if defense counsel's statement to the trial court were sufficient to preserve the issue on appeal, we would conclude that, based on the evidence presented at the preliminary hearing, the decision to impound defendant's vehicle was not unreasonable.

At the preliminary hearing, Officer Breegle testified about the circumstances surrounding the search and seizure. He testified that he conducted a traffic stop of

defendant's car because there was an object hanging from the rear view mirror that obstructed the driver's view. That object was an air freshener measuring approximately four and one-half inches long by two and one-half inches wide, with the thickness of a thin piece of cardboard. When he asked defendant for his license, registration, and proof of insurance, defendant told him he only had a permit and did not have a driver's license. Officer Breegle decided to issue a citation for driving without a valid license, and to impound the car. He conducted an inventory search in preparation for impound, found a loaded handgun under the driver's seat, and arrested defendant for possession of a loaded firearm.

There is no question that a police officer is authorized by statute to impound a vehicle when the officer issues the driver a notice to appear for failure to have a valid driver's license. (Veh. Code, § 22651, subd. (p); *People v. Hoyos* (2007) 41 Cal.4th 872, 892.) Defendant argues, however, that "[d]espite this statutory authorization, . . . '[t]he impoundment must still serve a community caretaking function.'" (Citing *People v. Williams* (2006) 145 Cal.App.4th 756, 763.)

Defendant's reliance on *People v. Williams* is misplaced. In that case, the police officer stopped the defendant's car because defendant was not wearing his seatbelt. The defendant pulled over, parked the car (in front of his residence), and provided the officer with his valid driver's license. The officer checked his computer and discovered there was an outstanding warrant for the defendant's arrest. The officer placed defendant under arrest and impounded the car. (*People v. Williams*, *supra*, 145 Cal.App.4th at pp. 759-760.) The appellate court noted that even though Vehicle Code section 22651, subdivision (h)(1), "authorizes law enforcement officers to 'remove' a vehicle when they make a custodial arrest of a person 'driving or in control of' the vehicle, this statutory authorization does not, in and of itself, determine the constitutional reasonableness of the seizure." (*Id.* at p. 762.) The court concluded the seizure in that case was unreasonable because the

15

officer "admitted that the car was legally parked in front of appellant's residence, appellant *had a valid driver's license*, the car was properly registered to a car rental company, the car had not been reported stolen, and he had no reason to believe appellant was not in lawful possession of the car." (*Ibid.*, italics added.)

In this case, at the time Officer Breegle decided to impound defendant's car, he did not intend to arrest defendant. Because defendant did not have a valid driver's license but nonetheless was driving, there was danger that he would continue to drive his car. Therefore, it was reasonable for Officer Breegle to impound the car to ensure that defendant did not get back into his car and drive off as soon as the officer left.

D.      *Increased Base Mandatory Minimum Sentence on Murder Count*

Section 190, subdivision (a) provides in relevant part: "Except as provided in subdivision (b), (c), or (d), every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 15 years to life." Under subdivision (d), the term for second degree murder is increased to 20 years to life "if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (§ 190, subd. (d).) Defendant was sentenced to 20 years to life in prison for the second degree murder of Vasquez. He contends on appeal that this sentence is unauthorized because the jury was not asked to make the findings required to impose the increased mandatory minimum term. We find that the trial court's failure to instruct the jury and obtain findings necessary to impose the increased term under section 190, subdivision (d) was harmless beyond a reasonable doubt.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

16

and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) Similarly, any fact that increases the mandatory minimum sentence also must be submitted to a jury and proved beyond a reasonable doubt. (*Alleyne v. United States* (2013) ___ U.S. ___ [133 S.Ct. 2151, 2155].) Failing to submit a sentencing factor to the jury, however, is not structural error, and does not require reversal if the error is found to be harmless beyond a reasonable doubt. (*Washington v. Recuenco* (2006) 548 U.S. 212, 222; *Neder v. United States* (1999) 527 U.S. 1, 15.)

Here, although the jury did not make express findings as to defendant's intent with regard to Vasquez, by finding defendant guilty of the attempted murders of Lopez and Mendoza the jury necessarily found that defendant intended to kill both of them. Having found that defendant intended to kill the two passengers, it follows that the jury necessarily found he intended to kill Vasquez as well, since the three men were sitting in a single line, with Vasquez closest to defendant.

In reaching this conclusion, we acknowledge that the jury was instructed on the prosecution's two theories for finding defendant guilty of first degree murder, including intentional drive-by murder -- defined in section 189 as "any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death" -- and acquitted defendant of first degree murder. But we note that defense counsel, in his closing argument, erroneously argued that the absence of premeditation and deliberation required a finding of second degree, rather than first degree, murder. Thus, the jury could have found that defendant intended to kill Vasquez, but acquitted him of first degree murder "'through mistake, compromise, or lenity.'" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.)

17

In light of the overwhelming evidence presented, and the jury's verdicts finding defendant guilty of the attempted murders of Lopez and Mendoza, we find the failure to submit the element of intent to inflict great bodily injury to the jury was harmless beyond a reasonable doubt.

E.      *Admission of Entire Recording of Diana Villeda's Interview*

As noted, Detective Carrillo identified Diana Villeda as the person who may have been the passenger in the Honda at the time of the shooting, and asked her to come to the police station to be interviewed. During that first interview, she described the shooting and said that defendant was the shooter. She later recanted, and said that Roger May was the shooter. Defendant called her as a witness at trial, where she testified that May was the shooter. Defense counsel asked her during direct examination why she told Detective Carrillo during her first interview that defendant was the shooter. She said that when she was asked to speak with the detectives, she thought it was about something else; when they asked about the shooting, she did not say it was May because she felt threatened by May's family.

The prosecution played the recording of that interview during cross-examination. Before the recording was played, defense counsel objected to playing the final minutes of the interview (represented on the last two pages of the transcript of the recording), when, in response to Diana's statement that she thought she had been called in to talk to the detectives about a different incident, Detective Carrillo said, "Actually I'm going to be honest with you, it's a series of things that [defendant] has been doing, it included the shooting on Silver Lake, the incident in front of your house with your mom and Byron's brother, the gun he recently got arrested with in his car, and there is a couple other things. [Defendant] has been busy, and that is why my partner was asking if he bragged to you about

18

any other stuff that he might have gotten away with." The trial court overruled the objection, and allowed the entire tape to be played.

On appeal, defendant argues the trial court abused its discretion by allowing the final part of the interview to be played for the jury, because Detective Carrillo's suggestion that defendant had committed other bad acts was irrelevant and prejudicial. We need not determine whether admission of Detective Carrillo's statement was erroneous, because even if we assume error we find the admission was harmless.

We review the assumed evidentiary error under *People v. Watson* (1956) 46 Cal.2d 818, 836, and determine whether it is reasonably probable that, in the absence of the error, a result more favorable to defendant would have been reached. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) We conclude that no such probability exists here.

There can be no prejudice caused by Detective Carrillo's reference to the shooting on Silver Lake or the gun found in defendant's car, because those are two of the acts for which defendant was on trial. The third "bad act" that Detective Carrillo mentioned was the incident that Diana believed was the reason she had been asked to speak with the detectives. And that incident not only had been discussed earlier in the interview, but by Diana's description, defendant had been coming to the aid of Diana's mother.[14] Finally, Detective Carrillo's reference to "a couple other things" that defendant purportedly had done recently was so vague and fleeting that it could not have caused prejudice.

---

[14] The interview began with Detective Carrillo asking Diana about a complaint that apparently was made by the brother of Diana's baby's father against defendant. Diana told the detectives that the father's family was angry that Diana was asking for child support, and the brother came to the house and was making a scene. She said that the brother tried to hit her mother just as defendant was driving by, and that defendant stopped and got out of the car because he thought the brother had hit her mother.

19

F.    *Habeas Corpus Petition*

In his petition for writ of habeas corpus, defendant asserts that his trial counsel rendered ineffective assistance by failing to bring in the trial court a motion to suppress the gun found in his car.  We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant '"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."'  [Citation.]  . . . [P]rejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)  The Supreme Court has instructed that a court deciding an ineffective assistance claim "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *In re Cox* (2003) 30 Cal.4th 974, 1019-1020.)

We conclude that defendant did not suffer prejudice as a result of his trial counsel's failure to bring the motion to suppress in the trial court.  In attempting to show prejudice from his counsel's purportedly deficient performance, defendant makes the same argument that he made on appeal, i.e., that evidence of the gun found in his car should have been suppressed because Officer Breegle's decision to impound his car was unreasonable.  As we explained in Section C., *ante*, it was

20

reasonable for Officer Breegle to impound the car in light of the circumstances at the time he made the decision to impound. Therefore, even if defense counsel had properly brought the motion to suppress, it would not have been successful.

## DISPOSITION

The judgment is affirmed, and the petition for writ of habeas corpus is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.